IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01221-PAB-CBS

WATER PIK, INC., a Delaware corporation,

    Plaintiff,

v.

MED-SYSTEMS, INC., a Washington corporation,

    Defendant.

---

**ORDER**

---

    Plaintiff Water Pik, Inc. ("Water Pik") brought this declaratory judgment action against defendant Med-Systems, Inc. ("Med-Systems") after Med-Systems opposed the registration of Water Pik's SinuSense™ mark in the Trademark Trial and Appeals Board ("TTAB"). Water Pik seeks a declaratory judgment finding that the SinuSense™ mark does not: (1) infringe the Sinu*Cleanse*® mark; (2) infringe Sinu*Cleanse*®'s trade dress; and (3) dilute the Sinu*Cleanse*® mark. Docket No. 117 at 4. Additionally, Water Pik seeks a declaratory judgment finding that Water Pik has the right to register and use the SinuSense™ mark. *Id*. In response, Med-Systems alleges counterclaims against Water Pik for: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) trade dress infringement; (3) unfair competition; and (4) trademark dilution. *Id*. at 7.

    This matter is presently before the Court on Med-Systems' Motion in Limine to Exclude Water Pik's Consumer Confusion Expert Gary T. Ford [Docket No. 167]. Med-

Systems seeks to exclude the testimony of Dr. Gary T. Ford ("Dr. Ford") in its entirety pursuant to Rules 702, 703, 402, and 403 of the Federal Rules of Evidence. Docket No. 167 at 1. The motion is fully briefed and ripe for disposition.

## I.   FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the specific proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that

function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While the proponents of the challenged testimony have the burden of establishing admissibility, their proffer is tested against the standard of reliability, not correctness; they need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

In sum, expert testimony must be excluded if the expert is unqualified to render an opinion of the type proffered, if the opinion is unreliable, if the opinion will not assist the trier of fact, or if the opinion is irrelevant to a material issue in the case.

## II.  PLAINTIFF'S EXPERT – DR. GARY T. FORD

Water Pik retained Dr. Ford to conduct a survey examining the likelihood of confusion between SinuSense™ and Sinu*Cleanse*®.  Docket No. 193 at 2.  In order to determine the likelihood of confusion, Dr. Ford performed a mall intercept survey in sixteen different malls around the country.  Docket No. 167-1 at 5.  Dr. Ford compiled a sample for the survey designed to reflect the demographics in a market research study performed in 2009 by Lynx Research Consulting.  *Id*.  The survey sample was comprised of male and female respondents between 18 and 64 years of age who had used a neti pot in the past six months for seasonal nasal allergy or sinusitis and were likely to purchase a replacement neti pot in the next six months.  *Id*.  The respondents were randomly assigned into two groups, with the first group exposed to the SinuSense™ mark and the second (control) group exposed to NeilMed's NasaFlo® neti pot.[1]  After initial screening questions, consumers were asked the following four questions:

1.  If you have an opinion, what company makes or puts out this product?

2.  If you have an opinion, do you or do you not think that the company that makes or puts out this product makes any other brand or brands of neti pots?

---

[1] NeilMed's NasaFlo® is one of the leading products in the sinus irrigation market.  Docket No. 167-2 at 20.

      3.      If you have an opinion, do you or do you not think that the company that makes or puts out this product is connected or associated with any other company or companies?

      4.      If you have an opinion, do you or do you not think that the company that makes or puts out this product has authorization or permission from any other company or companies.

Docket No. 193 at 2.

The results of the survey showed that only one of the 164 respondents in the first group (0.6%) believed that SinuSense™ had an association or connection with Sinu*Cleanse*®. Docket No. 167-1 at 17. Dr. Ford determined that a 0.6% likelihood of confusion was not statistically significant. *Id*. Based on the survey results, Dr. Ford opined that "there is no confusion nor is there any likelihood of confusion between the SinuSense™ and Sinu*Cleanse*® marks or trade dress." *Id*.

Med-Systems challenges the admissibility of Dr. Ford's survey results and opinions. Specifically, Med-Systems asserts that Dr. Ford's survey is fundamentally flawed because: (1) it failed to test the universe[2] of consumers who are most likely to buy Water Pik's goods; (2) the chosen sample was not a fair sampling of the target universe; and (3) the questions posed could not adequately determine the likelihood of confusion between the two marks. Docket No. 167 at 2. According to Med-Systems, these errors render Dr. Ford's survey and conclusions inadmissible. *Id*.[3]

---

[2] A survey "universe" is that segment of the population whose perceptions and state of mind are relevant to the issues in a particular case. *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-19 (3rd Cir. 2004).

[3] Med-Systems does not challenge Dr. Ford's qualifications either to conduct such a survey or to form opinions based on this type of survey. *See* Docket No. 167.

5

## III. ANALYSIS

### A. Survey Evidence

Parties to trademark infringement actions may use consumer surveys to demonstrate or refute a likelihood of consumer confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002). A survey's evidentiary value depends on the methodology used and the questions presented to respondents. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999). "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 at 32-333 (4th ed. 2011) (hereinafter MCCARTHY).[4] *Daubert* underscores the trial court's responsibility to ensure that scientific or technical evidence is both reliable and relevant. *Daubert*, 509 U.S. at 589.

To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the universe was properly chosen and defined; (2) the sample was representative of that universe; (3) the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were leading or suggestive; and (5) the data was accurately gathered and reported. *See* MCCARTHY § 32:159. Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence,

---

[4] Both parties cite to MCCARTHY in support of their respective arguments. Therefore, the Court will assume that McCarthy's survey methodology is generally accepted within the relevant field.

not the survey's admissibility. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987). However, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence." *Hodgdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007).

### B. Universe of Consumers

Med-Systems argues that Dr. Ford's survey is underinclusive because it did not focus on all potential consumers for the entire SinuSense™ product line. Docket No. 167 at 6. Med-Systems contends that Dr. Ford's survey did not target the relevant universe of consumers because it: (1) focused exclusively on past and current users of neti pots; (2) did not determine whether the respondents were familiar with the Sinu*Cleanse*® mark; (3) failed to show the respondents all the SinuSense™ products; and (4) excluded preventative users as well as individuals over the age of 64. *Id*. at 7-10. Med-Systems alleges that the failure to incorporate the entire universe of consumers deprives the survey of any probative value and makes its conclusions irrelevant. *Id*.

The adequacy of the survey universe is an important factor in assessing the validity of a survey. *See Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996). A survey's "appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (quotation marks and citation omitted). A court should only exclude a survey if the

"sample of respondents clearly does not represent the universe it is intended to reflect." *Big Dog Motorcycles, LLC v. Big Dog Holdings*, *Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005). Otherwise, issues concerning the sufficiency of the sample go to the weight and not the admissibility of the evidence. *See Harolds Stores, Inc.*, 82 F.3d at 1546.

In this case, Med-Systems' counterclaim for trademark infringement is based on the theory of forward confusion. Forward confusion occurs when the junior user diverts a senior user's customers and "attempts to capitalize on" the senior user's existing reputation and goodwill. *Altira Group LLC v. Philip Morris Cos. Inc.,* 207 F. Supp. 2d 1193, 1197 (D. Colo. 2002). In cases of forward confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services." MCCARTHY § 32:159 (emphasis in original).

Here, Med-Systems argues that Dr. Ford's survey did not target the relevant universe of consumers because it focused exclusively on past and current users of neti pots. Med-Systems argues that, by focusing on this universe, the survey erroneously focused on respondents who are more likely to be familiar with Sinu*Cleanse*® than SinuSense™. Docket No. 167 at 6. Additionally, Med-Systems contends that the focus on past and current users of neti pots excludes prospective consumers who have yet to purchase a neti pot but may be aware of the marks. *Id.* at 7. Med-Systems asserts that, because past and current users of neti pots are more likely to be familiar with Sinu*Cleanse*® when compared to prospective consumers, Dr. Ford's survey focused on

the wrong universe because the respondents represent likely purchasers of Med-Systems' products and not Water Pik's goods.

Med-Systems' argument is mistaken in that it confuses consumers who are likely to buy neti pots with those who are likely to be familiar with particular marks. Because the focus of surveys in forward confusion claims are consumers likely to buy the junior user's goods, in cases such as this, where Med-Systems and Water Pik market their products to similar groups, it is not uncommon for likely consumers of the junior user's products to be familiar with both the junior and senior marks. *See General Motors Co. v. Urban Gorilla, LLC,* 2010 WL 5395065, at *17 (D. Utah Dec. 27, 2010) (relying on a survey universe that included consumers who bought an SUV in the last three years because both parties marketed their products to these consumers). In fact, the entire premise of forward confusion is the junior user's ability to divert a senior user's customers and free ride off the senior user's existing reputation and goodwill. *See Altira Group LLC*, 207 F. Supp. 2d at 1197. Thus, the simple fact that likely SinuSense™ consumers are familiar with the Sinu*Cleanse*® mark does not, by itself, exclude these consumers from the survey universe. If all of these consumers were eliminated from the survey universe, then the survey would never find a likelihood of confusion. Moreover, as Water Pik argues, the inclusion of consumers familiar with Sinu*Cleanse*® actually increases the likelihood of including within the universe consumers who may be confused by the SinuSense™ mark. Docket No. 193 at 8. Therefore, the Court finds that a survey with a target universe focused on past and current neti pot users is relevant because it is probative of a likelihood of confusion.

Second, Med-Systems alleges that the survey is flawed because it did not determine whether the respondents were familiar with the Sinu*Cleanse*® mark. Docket No. 167 at 8. However, as noted above, the focus of a consumer confusion survey should be the junior user's goods. *See* MCCARTHY § 32:159. Therefore, Med-Systems' argument in this regard is meritless.

Third, Med-Systems claims that Dr. Ford's decision to test the respondents' opinions regarding only the neti pot and not Water Pik's other products bearing the SinuSense™ mark, such as water pulsators, squeeze bottles, or saline packets, makes the survey underinclusive because it excludes a large portion of potential consumers. Docket No. 167 at 8-9. However, this argument relates to the sufficiency of the sample, which goes to weight, and does not support an exclusion of the survey in its entirety. *See Harolds Stores, Inc.*, 82 F.3d at 1546 (finding that a survey focused primarily on female undergraduates at SMU, though underinclusive, was still probative of opinions relevant to the litigation).

Finally, Med-Systems contends that Dr. Ford's survey is underinclusive because it excludes "preventative" users that make up a "fair amount" of users and excludes individuals over the age of 64 who constitute 14.1% of the population suffering from chronic sinusitis. Docket No. 167 at 9. However, even if the survey excludes preventative users, this factor would go to the weight of the evidence and not its admissibility. Further, there is no evidence in the record showing what percentage of preventative users utilize neti pots as opposed to other nasal wash remedies. Thus, without more, the exclusion of preventative users from the survey is not sufficient to undermine the overall admissibility of the survey. As to the exclusion of those over 64

years of age, Dr. Ford opined that, although they constitute 14.1% of chronic sinusitis sufferers, their exclusion from the survey did not have a statistically meaningful impact on the results of the survey. Docket No. 194-3 at 7-9 (Ford Dep. 53:19-55:5). Therefore, the Court finds that this exclusion does not affect the report's admissibility.

Accordingly, the Court finds that Med-Systems' objections to Dr. Ford's survey are unavailing because they relate only to the sufficiency of the sample. *See Big Dog Motorcycles, LLC*, 402 F. Supp. 2d at 1334. Despite the limitations identified by defendant, the responses and conclusions in Dr. Ford's report are probative of the degree of confusion in the marketplace between the SinuSense™ mark and the Sinu*Cleanse*® mark. Therefore, Dr. Ford's survey is admissible because it has some probative value as it is representative of a fair sample of purchasers likely to purchase the junior user's goods. *See Brunswick Corp.*, 832 F.2d at 523 n.6 (finding that a survey universe including persons over 14 years old who had fished in freshwater during previous twelve months sampled persons likely to purchase fishing reels and was therefore probative of the likelihood of confusion between two fishing reel manufacturers); *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1225-26 (D. Colo. 2001) (concluding that an underinclusive survey of potential car drivers with a 4.7% margin of error was probative on the issue of confusion despite the deficiencies in the chosen universe and statistical error rates marring the results).

### C. Dr. Ford's Sample

Med-Systems argues that, even if the survey's universe is probative, Dr. Ford's survey sample is not representative of the target universe because it relies exclusively

on the Lynx report to draw its representative sample. *Id*; Docket No. 167-1 at 35 (Ford Dep. 59:13-25). Med-Systems claims that the Lynx report focused on whether individuals were likely to try nasal wash products generally and was not limited to potential neti pot users. *See generally* Docket No. 167-5. As such, the Lynx report does not accurately narrow the population of neti pot users. Docket No. 200 at 7. Additionally, Med-Systems contends that the Lynx report does not provide an explanation of its sampling methodology or reveal the source of the survey demographics. Docket No. 200 at 8. As a result, Med-Systems claims that, because Dr. Ford did not examine the Lynx report's sampling methodology but merely assumed that the information was accurate, the survey's results are systematically flawed and should be excluded as irrelevant under Fed. R. Evid. 402. Docket No. 167 at 13.

Although technical and methodological deficiencies in a survey typically bear on the weight of the evidence, *Brunswick Corp.*, 832 F.2d at 523, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence." *Hodgdon Powder Co.,* 512 F. Supp. 2d at 1181. Here, Dr. Ford's reliance on the Lynx report without an examination of the underlying sampling methodology poses questions about the survey's overall reliability. *See* MCCARTHY § 32:159 ("A survey of the wrong 'universe' will be of little probative value in litigation."). This is especially true because Dr. Ford's survey was based on a nonprobability representative sample and not a probability sample. Docket No. 167-1 at 19 (Ford Dep. 29:24 - 30:15); *see* MCCARTHY § 32:159 ("only a probability sample can be projected to the entire universe by the use of definite mathematical and statistical

probability models."). In a representative survey, the goal is to design a sample that is representative of the underlying target population. *Id*. In accordance with this practice, Dr. Ford constructed his survey based on several assumptions contained in the Lynx report. For example, Dr. Ford fixed gender quotas at 50% male and 50% female and limited the respondents to those between 18-64 years of age. Docket No. 167-1 at 5, ¶ 24. Additionally, Dr. Ford did not consider other demographic data such as income or education levels because he believed these would be encompassed in the representative sample. Docket No. 167-1 at 35 (Ford Dep. 59:1-8). Thus, if the methodology of the Lynx report is unsound, it may severely undermine Dr. Ford's survey. Although the proponent of the expert opinion has the burden of proof, *see Crabbe*, 556 F. Supp. 2d at 1221 (noting that the proponent of the expert has the burden of proving that the methodology applied is otherwise reliable and generally accepted), because this issue was not fully briefed by the parties it is unclear to what extent this error impacts the survey's overall conclusions. Thus, the Court will reserve ruling on this particular issue and request that the parties provide supplemental briefing on the Lynx report's methodology and whether Dr. Ford's reliance on the Lynx report renders his findings irrelevant.

### D.   Dr. Ford's Survey Design

Finally, Med-Systems argues that Dr. Ford's survey design is systematically flawed because it: (1) fails to expose respondents to both the SinuSense™ and the Sinu*Cleanse*® marks and trade dress; (2) allows respondents to view the stimulus during survey questioning; and (3) demands that customers identify the company name

rather than the brand name. Docket No. 167 at 13. The Court finds all of these arguments unavailing.

First, Med-Systems argues that Dr. Ford's survey is flawed because it does not expose consumers to both the SinuSense™ and Sinu*Cleanse*® marks. However, the Tenth Circuit has repeatedly explained that "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487-88 (10th Cir. 1987). A survey that conducts such a side-by-side comparison "bears little resemblance to the actual workings of the marketplace." *Id*. at 1488; *Univ. of Kansas v. Sinks*, 2008 WL 755065, at *5 (D. Kan. March 19, 2008). The inquiry of a likelihood of confusion is instead based entirely on the overall looks of the competing products when singly presented. *King of the Mountain Sports, Inc.,* 185 F.3d at 1090.

Here, Med-Systems does not provide evidence that the products are ever sold side-by-side. *See* Docket No. 193-4 at 3 (Gallo Dep. 64:19-23). Thus, performing a survey with a side-by-side comparison would not accurately account for the marketplace conditions under which consumers encounter the two competing marks. *See* MCCARTHY § 32:159 (noting that, in cases of forward confusion, the proper universe to survey is the potential buyers of the junior user's goods or services). Moreover, because the focus of forward confusion is whether the junior user's mark benefits from the senior user's goodwill, a focus on the junior's mark is consistent with determining whether potential customers are indeed confused. *See Jordache Enters., Inc.,* 828 F.2d at 1488 n.5 ("Other surveys have easily avoided 'side-by-side'

comparisons by simply showing a consumer the product bearing the allegedly confusing mark and asking who manufactures the product and what other products are sold by that manufacturer."). Accordingly, Med-Systems' objection to Dr. Ford's failure to show consumers both the SinuSense™ and the Sinu*Cleanse*® is rejected.

Second, Med-Systems argues that Dr. Ford's survey is flawed because the respondents were permitted to view the stimulus during questioning. However, surveys only provide useful evidence of confusion if the survey mirrors a real world setting. *See Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991). Additionally, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." MCCARTHY § 32:163. In this case, it is undisputed that customers are able to touch the packages and examine the neti pots before making a purchase. *See* Docket No. 194-2 at 10 (Belch Dep. 96:8-12) ("[in] the actual world [consumers] in the store . . . handle the boxes and so forth."). Moreover, Med-Systems' own expert, Dr. Belch, concedes that, in order to simulate the actual marketplace, it would be preferable for the consumers in the survey to have the ability to touch the box. Docket No. 194-2 at 9 (Belch Dep. 95:22-23) ("I think it would be better if people could hold the box [in surveys to replicate market conditions]."). Therefore, Med-Systems' argument that Dr. Ford's survey was flawed because it permitted the respondents to handle the merchandise is unconvincing because the survey accurately accounted for marketplace conditions under which consumers encounter the neti pots.

Third, Med-Systems argues that Dr. Ford's survey is flawed because it requires that respondents identify the company name rather than the product's brand name.

15

However, the inquiry under both a trademark infringement and a trade dress claim is whether the marks are so similar that "there is a likelihood of confusion among consumers as to the *source* of the competing products." *General Motors Co.*, 2010 WL 5395065 at *13 (emphasis added); *see Sally Beauty Co., Inc.*, 304 F.3d at 979 ("[t]he factors underlying a likelihood of confusion analysis in a trademark infringement claim apply equally to trade dress infringement claims."). Thus, for a survey to test confusion it must determine whether the "ordinary prospective purchaser, exercising due care in the circumstances, is likely to regard [the junior mark] as coming from the same source as the trade-marked article [the senior mark]." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir. 1984); *see John Allan Co. v. Craig Allen Co. LLC*, 540 F.3d 1133, 1138 (10th Cir. 2008) ("confusion results when a mark is likely to deceive purchasers or users as to the source, endorsement, affiliation, or sponsorship of a product."); MCCARTHY § 15:11 at 15-22 ("the buyer, to be deceived, must be looking for some symbol which she thinks identifies a single, albeit anonymous, source."). Moreover, Dr. Ford's experiment was tailored to Professor McCarthy's generally accepted "Standard Format" to test confusion in trademark cases. *See* Docket No. 167-1. Further, it would make little sense to test a consumer's confusion with regard to the source of a product by simply asking him to name the brand or the mark. Therefore, the Court finds that Med-Systems' argument is unconvincing because the survey questions appropriately tested confusion with regard to the source of the marks and Dr. Ford followed generally accepted methods in framing the questions of the survey. *Big O Tires, Inc.*, 167 F. Supp. 2d at 1225 (finding that a survey where

consumers were asked whether the marks were made by the same or different companies was admissible to test confusion).

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that the parties shall submit supplemental briefs discussing the Lynx report's effect on the admissibility of Dr. Ford's survey.  The briefs shall be no longer than ten pages and shall be submitted by January 11, 2012.

DATED January 5, 2012.

                                            BY THE COURT:

                                            s/Philip A. Brimmer
                                            PHILIP A. BRIMMER
                                            United States District Judge