IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01221-PAB-CBS

WATER PIK, INC., a Delaware corporation,

    Plaintiff,

v.

MED-SYSTEMS, INC., a Washington corporation,

    Defendant.

---

**ORDER**

---

This matter is before the Court on Med-Systems' Motion in Limine to Exclude Water Pik's Consumer Confusion Expert Gary T. Ford [Docket No. 167] and the supplemental briefs submitted by the parties discussing the effects of the Lynx report on the admissibility of Dr. Ford's survey [Docket Nos. 224, 226]. The Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338.

**I. BACKGROUND**

Water Pik brought this declaratory judgment action against defendant Med-Systems, Inc. and seeks a judgment finding that its SinuSense™ mark does not: (1) infringe Med-Systems' Sinu*Cleanse*® mark; (2) infringe Sinu*Cleanse*®'s trade dress; and (3) dilute the Sinu*Cleanse*® mark. Docket No. 117 at 4. In preparation for trial, Water Pik retained Dr. Gary T. Ford to conduct a survey examining the likelihood of confusion between SinuSense™ and Sinu*Cleanse*®. Docket No. 193 at 2. To determine the likelihood of confusion between the marks, Dr. Ford performed a mall

intercept survey in sixteen different malls around the country. Docket No. 167-1 at 5. The results of the survey showed that only one of the 164 respondents (0.6%) believed that SinuSense™ had an association or connection with Sinu*Cleanse*®. *Id*. at 17. Dr. Ford determined that a 0.6% likelihood of confusion between SinuSense™ and Sinu*Cleanse*® was not statistically significant. *Id*. Accordingly, Dr. Ford opined that "there is no confusion nor is there any likelihood of confusion between the SinuSense™ and Sinu*Cleanse*® marks or trade dress." *Id*.

Med-Systems challenges the admissibility of Dr. Ford's testimony in its entirety because of alleged deficiencies in the survey's methodology. Docket No. 167 at 6. Specifically, Med-Systems argues that Dr. Ford's survey is fundamentally flawed because: (1) it failed to test the relevant universe[1] of consumers; (2) the survey's sample was not representative of the target universe; and (3) the questions posed in the survey could not adequately determine the likelihood of confusion between the SinuSense™ and Sinu*Cleanse*® marks. *Id*. at 2. According to Med-Systems, these errors rendered Dr. Ford's survey and its conclusions inadmissible.[2]

In a previous Order [Docket No. 209], the Court concluded that Dr. Ford's survey targeted the relevant universe because the respondents were representative of a fair sample of consumers likely to purchase SinuSense™ products. Docket No. 209 at 11. The Court further found that, because Dr. Ford's survey utilized methods generally

---

[1] A survey "universe" is that segment of the population whose perceptions and state of mind are relevant to the issues of a particular case. *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-19 (3rd Cir. 2004).

[2] Med-Systems does not challenge Dr. Ford's qualifications either to conduct such a survey or to form opinions based on this type of survey.

2

accepted in the relevant field to test confusion, the questions posed in the survey were pertinent to the question of a likelihood of confusion. *Id*. at 16-17. Nonetheless, the Court reserved ruling on the motion because Dr. Ford relied on the demographic breakdown found in the Lynx Report without verifying the Lynx Report's methodology. *Id*. at 12-13. The parties were ordered to submit supplemental briefing on the Lynx Report and its relationship to Dr. Ford's survey.

In its supplemental brief, Med-Systems argues that Dr. Ford's reliance on the Lynx report is professionally unsound because: (1) the demographics in the Lynx Report do not represent his identified universe of neti pot users; (2) the Lynx Report fails to identify the demographics utilized to create its core sample; and (3) the Lynx Report artificially increases the number of respondents from four specific groups, rendering its results entirely unreliable. Docket No. 224 at 2.

### A.   The Lynx Report

In the spring of 2009, Michael Wakeman, Water Pik's Vice President of Marketing, together with Blue Sky Strategies and Lynx Research Consulting, administered two surveys to identify the size, demographics, and characteristics of the potential market segment for nasal wash products. Docket No. 226-1 at 1, ¶ 6. Water Pik conducted the survey process in two separate stages: first, it directed an "omnibus survey"[3] with a national representative sample of 1002 adults; second, based on the

---

[3]"Omnibus surveys" are frequently used when a researcher wants to learn the characteristics of the respondents who should be sampled, so that a subsequent, more detailed, survey interviews the proper respondents according to age, gender, and other important criteria. In this case, the Lynx omnibus survey included five questions regarding sinusitis, seasonal allergies, and usage of nasal wash products. Docket No. 226-2 at 2 n. 4.

results of the omnibus survey, Water Pik created a sampling plan for a national, in-depth online survey (the "A&U Survey"). *Id.* at ¶¶ 7-8. The Lynx Report is a compilation of the results of the A&U Survey. *Id.* at ¶ 9.

The omnibus survey utilized demographics of the U.S. population based on U.S. Census data. Docket No. 226-1 at 2, ¶ 7. The survey respondents were representative of the age, income, and ethnicity of the general population of the United States. *Id.* The stated objectives for the omnibus survey included determining the incidence of sinusitis and seasonal allergy sufferers in the population, providing preliminary insight into the demographic characteristics of consumers in each ailment category, and defining key consumer groups to aid in the study design for the A&U Survey. Docket No. 226-1 at 9. The omnibus survey questioned 1002 respondents and determined that 27% (183/680) of allergy and sinusitis sufferers used a nasal wash and that neti pot users consisted of 6% (64/1002) of all respondents. Docket No. 226-1 at 21. The omnibus survey also revealed that of neti pot users, 42.2% (27/64) were males, 57.8% (37/64) were females, 40.6% (26/64) were between 18 and 34 years of age, 54.7% (35/64) were between 35 and 64, and 4.7% (3/64) were 65 or older. Docket No. 226-2 at 7. Based on the results of the omnibus survey, Lynx Research Consulting conducted the A&U Survey. Docket No. 226-1 at 2, ¶ 8.

The A&U Survey consisted of 1,513 respondents in a core representative sample. Docket No. 226-5 at 6. To participate in the online survey, respondents had to meet the following criteria: (1) adults between 18 and 64 years of age; (2) an annual household income of $30,000; (3) not employed in sensitive industries (i.e. marketing); and (4) one of the following: (a) adults with seasonal allergies or sinusitis; (b) parents

4

with children (4 to 17) who experience symptoms of seasonal allergies or sinusitis; or (c) adults who experience nasal irritation as a result of outdoor recreation or dusty working conditions. *Id*. The objective of the A&U Survey was to: (1) assess usage behaviors as they relate to current treatments (nasal wash and others); (2) determine the current level of awareness and usage of nasal wash products; (3) size the individual segments; and (4) profile target segments on demographic and attitudinal characteristics. Docket No. 226-5 at 5. The survey posed questions designed to determine whether respondents suffered from seasonal allergies or sinusitis and what treatment, if any, they used to handle their conditions. *See generally* Docket No. 226-7. The results of the A&U Survey revealed that 12.4% (187/1513) of the targeted population used a neti pot when treating their own symptoms or when caring for a child. Docket No. 226-2 at 9. The A&U Survey also showed that of neti pot users, 51.3% (96/187) were males, 48.7% (91/187) were females, 46.5% (87/187) were between 18 and 34 years of age, and 53.5% (100/187) were between 35 and 64. Docket No. 226-2 at 9. It also found that 46% of consumers who use nasal wash products use them to both treat and prevent symptoms, 51% use them to treat symptoms only, and 3% use them only for prevention. Docket No. 226-5 at 46.

## II.  FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the specific proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While the proponents of the challenged testimony have the burden of establishing admissibility, their proffer is tested against the standard of reliability, not correctness; they need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

In sum, expert testimony must be excluded if the expert is unqualified to render an opinion of the type proffered, if the opinion is unreliable, if the opinion will not assist the trier of fact, or if the opinion is irrelevant to a material issue in the case.

### III. ANALYSIS

#### A. Survey Evidence

Parties to trademark infringement actions may use consumer surveys to demonstrate or refute a likelihood of consumer confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002). A survey's evidentiary value depends on the methodology used and the questions presented to respondents. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999).

"[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 at 32-333 (4th ed. 2011) (hereinafter MCCARTHY).[4]  *Daubert* underscores the trial court's responsibility to ensure that scientific or technical evidence is both reliable and relevant. *Daubert*, 509 U.S. at 589.

To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the universe was properly chosen and defined; (2) the sample was representative of that universe; (3) the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were leading or suggestive; and (5) the data was accurately gathered and reported.  *See* MCCARTHY § 32:159.  Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).  However, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence." *Hodgdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007).

---

[4]Both parties cite to MCCARTHY in support of their respective arguments. Therefore, the Court will assume that McCarthy's survey methodology is generally accepted within the relevant field.

### B. The Lynx Report's Methodology

Med-Systems argues that the Lynx Report is unsound because: (1) it does not identify the source of its demographic criteria; (2) the Lynx Report's sample does not represent the general population of seasonal allergies and sinusitis sufferers; (3) the Lynx Report augmented the representative sample, skewing the survey's demographics; and (4) it does not describe the appropriate demographics of neti pot users. Docket No. 224 at 2-3. Med-Systems argues that these errors make the survey's findings irrelevant for the purposes of this case.

As to Med-Systems' first argument, the Lynx Report's demographic breakdown is clearly evident from the report and therefore is not flawed in that regard.

Med-Systems' second argument relates to the qualifying criteria placed on the A&U Survey. Docket No. 224 at 3. Med-Systems claims that the Lynx Report limited respondents to certain population demographics, which do not represent the general population of seasonal allergy and sinusitis sufferers. *Id*. The challenged categories include: (1) adults suffering from seasonal allergies and sinusitis; (2) parents with children suffering from seasonal allergies and sinusitis; (3) outdoor recreationists; and (4) individuals working in dusty conditions. Docket No. 224 at 3.

After a review of the record, it is evident that the A&U Survey set reasonable limits to sample the targeted population. The omnibus survey, which utilized Census data, showed that 65% of the adult population in the United States suffers from either seasonal allergies or sinusitis. Docket No. 226-1 at 18. Moreover, the study found that 24% of children (aged 4 to 17) in the U.S. suffer from either allergies or sinusitis and that children only account for 3% of sinusitis or allergy sufferers independent of their

parents. *Id*. Additionally, the omnibus survey found that 80% of the U.S. population either works in dusty conditions or are outdoor recreationists. *Id*. at 20. Of those who are outdoor recreationists, around 75% (520/711) have either allergies or sinusitis and 72% (376/520) of those working under dusty conditions suffer from either allergies or sinusitis (there is some overlap between dusty workers and outdoor recreationists). Docket No. 226-2 at 8. Thus, it was reasonable for the A&U Survey to limit the targeted population to adult sufferers, parents of children sufferers, outdoor recreationists, and dusty-condition workers as these were the segments of the population most likely to show symptoms of seasonal allergies or sinusitis.

Additionally, Med-Systems argues that the Lynx Report failed to place limits on the age, income, education, or regional location of respondents to ensure respondents accurately reflected the general population of seasonal allergy and sinusitis sufferers. *Id*. The A&U Survey restricted participants to: (1) adults between 18 and 64 years of age; (2) with an annual income of at least $30,000; (3) not employed in sensitive industries (i.e. marketing); and (4) one of the following: (a) adults suffering from seasonal allergies or sinusitis; (b) parents with children (4 to 17) who experience symptoms of seasonal allergies or sinusitis; or (c) adults who experience nasal irritation as a result of outdoor recreation or dusty working conditions. Docket No. 226-5 at 6. The A&U Survey ensured that all of the respondents were adults who suffered from either sinusitis or seasonal allergies or parents of children who suffered from the same symptoms. Although the A&U survey did not restrict participants based on education levels or regional location, this breakdown was unnecessary because the omnibus

survey had already taken such factors into account. Thus, contrary to Med-Systems' argument, the A&U Survey placed significant limits on its targeted population.

Third, Med-Systems argues that, by purposefully augmenting the population, the A&U Survey skewed the demographics away from the core representative sample. Docket No. 224 at 3. However, augmenting a representative sample does not undermine the survey's underlying methodology. So long as the survey selected respondents from the appropriate target universe, the augmentations relate only to the survey's general findings. In other words, the augmented population is only relevant to the extent that the augments skewed the Lynx Report's demographic breakdown of neti pot users.

After reviewing the raw data for the A&U Survey, Dr. Ford found that, of the 187 neti pot users, only 29 were from the augmented sample. Docket No. 226-2 at 6 n.8.[5] Dr. Ford concluded that the inclusion of the augmented sample did not have a substantive impact on the age or gender distribution of the neti pot users. Thus, it appears that the augmentation of the sample was not a serious deficiency and, as such, it relates only to the sufficiency of the sample, which goes to weight and not admissibility. *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546

---

[5] Med-Systems argues that Dr. Ford was not provided with the raw data until January 7, 2011 and therefore cannot use this information to justify his reliance on the Lynx Report. Docket No. 224 at 3 n.1. However, whether Dr. Ford tested the representativeness of the Lynx Report before he conducted his survey does not affect the ability to retrospectively determine the reliability of the report. So long as the data relied upon is accurate and reliable, Dr. Ford's survey is probative and relevant to the issues in this case. The Court has allowed both sides to supplement their briefing and will allow Water Pik to do so here to get to the bottom of this dispute.

Case 1:10-cv-01221-PAB-CBS   Document 258   Filed 01/24/12   USDC Colorado   Page 12 of 15

(10th Cir. 1996) (noting that issues regarding the sufficiency of the sample go to the weight and not the admissibility of the evidence).

Fourth, Med-Systems argues that the Lynx Report does not indicate the appropriate demographics of neti pot users and that, as a result, it is impossible to determine the representative demographics for neti pot users. Docket No. 224 at 3. The Court disagrees.

The data from the omnibus survey and the A&U Survey are largely consistent with Dr. Ford's chosen demographic limitations. The omnibus survey disclosed that neti pot users comprised 6% (64/1002) of the general population of the United States. Docket No. 226-2 at 7. The omnibus survey also revealed that, of neti pot users: (1) 42.2% (27/64) were males; (2) 57.8% (37/64) were females; (3) 40.6% (26/64) were between 18 and 34 years of age; (4) 54.7% (35/64) were between 35 and 64; and (6) 4.7% (3/64) were 65 or older. *Id*. The A&U Survey showed similar results as it found that: (1) 12.4% (187/1513) of respondents used a neti pot for their own symptoms or when treating a child; (2) 51.3% (96/187) of neti pot users were males; (3) 48.7% (91/187) of neti pot users were females; (4) 46.5% (87/187) were between 18 and 34 years of age; (6) and 53.5% (100/187) were between 35 and 64. *Id*. at 9.

Dr. Ford designed his survey to reflect demographics in the Lynx Report. Docket No. 209 at 4. In so doing, Dr. Ford limited his sampling distribution to 50% males and females with an age breakdown of 50% between 18 and 34 years of age and 50% between 35 and 64 years of age. *Id*. at 13. Dr. Ford explains that, although these numbers only approximated the distribution in the Lynx Report, he maintained the sampling distribution to preserve a sufficient number of respondents in each age and

gender group in order to re-weight the data if necessary.  Docket No. 226-2 at 4.  Because distribution of neti pot users is usually divided near 50% between gender and age, it was not unreasonable for Dr. Ford to set his survey boundaries at 50%.  Accordingly, the slight variations in percentages between Dr. Ford's survey and the Lynx Report are primarily technical deficiencies and are not enough to render the survey's conclusions untrustworthy.  See *Brunswick Corp.,* 832 F.2d at 532 (noting that technical and methodological deficiencies in a survey typically bear on the weight of the evidence).

### C.   Dr. Ford's Survey

Med-Systems argues that Dr. Ford's survey did not target the relevant universe because he surveyed only "consumer segments" and not "segments of nasal wash users" or "segments of users of sinus ailment products."  Docket No. 224 at 4.  However, Dr. Ford's survey targeted respondents who have "*used* a neti pot in the past six months" and also surveyed those who were "likely to *purchase* a replacement neti pot if needed."  Docket No. 167-1 at 5 (emphasis added).  Thus, contrary to Med-Systems' argument, Dr. Ford's survey questioned respondents who are users and likely purchasers.  As noted in the previous Order, the "appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services."  *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980).  Nothing in the record supports Med-Systems' assertion that there is a difference between "users" and "consumers."  Moreover, nothing in the record

shows that users are less likely to purchase a junior user's goods. Therefore Med-Systems' distinction between users and purchasers is tenuous at best.

Med-Systems also reiterates arguments already addressed by the Court in the previous Order. Specifically, Med-Systems argues that Dr. Ford's failure to include purchasers and consumers of other SinuSense™ products (i.e. squeeze bottles, saline packets and water pulsators) undermines the survey results. Docket No. 224 at 5. Med-Systems further asserts that Dr. Ford erred when he relied on the Lynx Report because the report questioned individuals who experienced symptoms of seasonal allergies or sinusitis and was not limited to users of nasal wash remedies. *Id.* at 6. Med-Systems claims that this over-inclusion of respondents in the sample means that, of those surveyed, many will never use a neti pot or any other nasal wash product. *Id*. In this regard, Med-Systems' arguments miss the mark.

As noted in the Court's previous Order, disputes regarding the under-inclusiveness of a survey only relate to the sufficiency of the sample. *See Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005). Additionally, solely because the Lynx Report was designed to test the market of all individuals with seasonal allergies and sinusitis does not make the findings of the Lynx Report irrelevant. Dr. Ford's representative sample only had to represent the population of neti pot users and their typical demographics. The fact that his chosen sample is consistent with the typical distribution of neti pot users in the A&U Survey and the omnibus survey is evidence that his chosen limitations were not unreasonable. Therefore, although it was perhaps imprudent for Dr. Ford to rely on the Lynx Report without verifying the report's methodology, because further analysis of the data does

not undermine Dr. Ford's conclusions, the Court finds that Dr. Ford's findings are relevant and probative on the issue of a likelihood of confusion.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that Med-Systems' Motion in Limine to Exclude Water Pik's Consumer Confusion Expert Gary T. Ford [Docket No. 167] is **DENIED**.

DATED January 24, 2012.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge