IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01221-PAB-CBS

WATER PIK, INC., a Delaware corporation,

    Plaintiff,

v.

MED-SYSTEMS, INC., a Washington corporation,

    Defendant.

---

**ORDER**

---

This matter is before the Court on the Motion for Reconsideration [Docket No. 271-Restricted/316-Redacted] filed by defendant Med-Systems, Inc.  In its motion, Med-Systems requests that the Court reconsider its Order [Docket No. 261] granting plaintiff Water Pik, Inc.'s motion for summary judgment.  The motion is fully briefed and ripe for resolution.

## I.  STANDARD OF REVIEW

A litigant subject to an adverse judgment, who seeks reconsideration by the district court of that adverse judgment, may file either a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e) or a motion seeking relief from the judgment pursuant to Fed. R. Civ. P. 60(b).  *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).  In order for a party to succeed on a Rule 59 motion, the party must show either "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest

injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). However, a Rule 59(e) motion is not a license to rehash arguments previously addressed or to advance new arguments that could have been raised previously. *Id*. Finally, the decision to grant a Rule 59(e) motion is left to the discretion of the district court. *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996) ("[I]n determining whether to grant or deny a Rule 59(e) motion to alter or amend the judgment, the district court is vested with considerable discretion.").

Under Rule 59(e) of the Federal Rules of Civil Procedure, a motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment. Fed. R. Civ. P. 59(e).  In this case, Final Judgment [Docket No. 264] entered on January 26, 2012 and Med-Systems filed its motion for reconsideration on February 1, 2012.  Because the motion was filed within twenty-eight days after judgment entered, the Court will consider the motion under Rule 59(e).  *See Van Skiver,* 952 F.2d at 1243 ("If a motion is served within [twenty eight] days of the rendition of judgment, the motion ordinarily will fall under Rule 59(e).").

**II.  ANALYSIS**

    **A.  Summary Judgment**

The Court granted summary judgment [Docket No. 261] against Med-Systems' counterclaims for (1) federal trademark infringement under 15 U.S.C. § 1114, (2) federal trade dress infringement under 15 U.S.C. § 1125(a), (3) unfair competition under 15 U.S.C. § 1125(a), and (4) trademark dilution under 15 U.S.C. § 1125(c). Docket No. 261 at 34-35.  In the instant motion, Med-Systems requests that the Court

2

reconsider the summary judgment order with respect to its trademark infringement counterclaim only.  Docket No. 271 at 1.  In support, Med-Systems claims that the Court committed clear error when it (1) failed to consider expert reports from Dr. Michael A. Belch and Dr. David M. Yerkes, (2) concluded that the prefix "sinu" is generic and is ubiquitous in the nasal irrigation market, and (3) failed to analyze the likelihood of confusion between the unstylized Sinu*Cleanse*® (non-italicized) mark and the SinuSense™ mark.  Docket No. 271 at 4.  For the Court to grant this request, Med-Systems must show that the Court's summary judgment order was based on a clear error of law.  *ClearOne Commc'n, Inc. v. Biamp Systems*, 653 F.3d 1163, 1179 (10th Cir. 2011) (noting that the Tenth Circuit reviews the denial of a Rule 59(e) motion for abuse of discretion to determine whether the district court's ruling relied on erroneous legal conclusions).

### B.  Dr. Michael A. Belch's Expert Report[1]

Med-Systems argues that the Court committed clear error when it failed to consider Dr. Belch's consumer survey in its analysis.  Docket No. 271 at 8. Med-Systems claims that Dr. Belch's consumer survey creates a triable issue of fact as to the likelihood of consumer confusion between the Sinu*Cleanse*® mark and the SinuSense™ mark.  *Id*. at 6.  Specifically, Med-Systems argues that Dr. Belch's report shows that there is a "strong similarity" between Sinu*Cleanse*® and SinuSense™ and a "high likelihood of potential confusion."  *Id*. at 9.  In its reply, Med-Systems further

---

[1]In briefing the motion for reconsideration, both parties incorporated their respective arguments from Water Pik's Motion in Limine to Exclude Testimony of Dr. Belch previously filed with the Court [Docket Nos. 165, 184, 207].  Accordingly, the Court will reconsider the parties' previous filings.

contends that, to the extent Dr. Belch's survey universe, sample, and methodology have flaws, these go to the weight of the evidence and not its admissibility.  Docket No. 311 at 6.

In response, Water Pik argues that Dr. Belch's report does not raise a genuine issue of material fact with regard to the likelihood of consumer confusion because it was not designed to test confusion as to the source of the marks and therefore cannot reliably establish a likelihood of consumer confusion.  Docket No. 306 at 3. Additionally, Water Pik contends that, because Dr. Belch's survey is "fatally biased and flawed," its conclusions lack any proper factual and legal foundation, "thereby rendering them unreliable, inadmissible, and irrelevant."  *Id*.

Parties to trademark infringement actions may use consumer surveys to demonstrate or refute a likelihood of consumer confusion.  *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002).  However, a survey's evidentiary value depends on the methodology used and the questions presented to respondents. *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534 n.3 (10th Cir. 1994).  To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the survey universe was properly chosen; (2) the sample was representative of that universe; (3) the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were not leading and suggestive; and (5) the data was accurately gathered and reported. *See* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2011) (hereinafter McCarthy).  Generally, technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the

4

weight of the evidence, not the survey's admissibility.  *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).  However, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey."  *Hodgdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007).

### 1.  Survey Format

Dr. Belch designed a double-blind survey utilizing a questionnaire that respondents completed on the internet.  Docket No. 271-1 at 3.  Dr. Belch's sample size consisted of 401 respondents who had purchased a sinus remedy product in the last six months or intended to purchase one in the next six months.  Docket No. 271-1 at 21.  The survey used preliminary questions to hide the true purpose of the survey from respondents.  *See id*. at 23-27.  Among other questions, respondents were asked the following:

> 3.      Tell me what comes to mind when I say:
>         a. SinuCleanse
>         b. SinuSense
>         c. Nielmed [sic]

Docket No. 271-1 at 25.  This question did not present the Sinu*Cleanse*® mark in its stylized format.  *Id*.  The survey then presented respondents with photographs of the package design for either the Neti pots or the saline packets.[2]  *Id*. at 26.  Of the 401 respondents, 203 were shown the saline packets, while 198 were shown the neti pot packaging.  *Id*.; *see also* Docket No. 165-4 at 17.  The packages were shown

_____

[2]A neti pot is a nasal irrigation device, which uses salt and water solution to flush out the nasal passages.  *See* Docket No. 57-1 at 2 (Heatly Dep. 10:10-15).  A saline packet is the salt-based solution used in neti pots.

individually and in random order to prevent order bias.  Docket No. 271-1 at 25.  The

respondents were then asked to rate the presentation and overall design of the

packaging on a seven point scale ranging from "1= Not at all appealing" to "7 = Very

appealing."  *Id*. at 26.  Subsequently, the packaging for the three brands was presented

side-by-side and respondents were asked:

> Now, please tell me whether you think that . . .
>
> (7a) Two or more of the products you see now are made by the same
> company; (7b) Which products that you see now are made by the same
> company? (7c) What makes you say that these products are made by the
> same company?  Anything else?
>
> Now, please tell me whether you think that . . .
>
> Looking at these products, do you think that . . .
>
> (8a) One or more of the COMPANIES WHO'S [sic] products you see now
> have a business affiliation or connection with the other shown here; (8b)
> What makes you say that these products have a business affiliation or
> connection with another shown here? Anything else?
>
> Looking at these products, do you think that . . .
>
> (9a) One or more of the products you see now received permission or
> approval from the others shown here; (9b) What makes you say that
> these products received permission or approval from another shown
> here? Anything else?

*Id*. at 27-28.  Finally, question No. 10 of the survey asked respondents to indicate on a

seven point scale ranging from "1 = Not at all similar" to "7 = Very similar" the similarity

of the following pairs: (a) "SinuCleanse and SinuSense"; (b) "Nielmed [sic] and

SinuCleanse," and (c) "SinuSense and Nielmed [sic]."  *Id*.

The results of the survey showed that, in answer to question No. 10, 43% of

respondents gave the "SinuCleanse and SinuSense" pair a rating of 6 or 7.  Docket No.

271-1 at 6.  Additionally, in response to question No. 7(a), 48.3% of respondents shown the saline packets believed that SinuCleanse and SinuSense were made by the same company.  *Id*. at 8.  Moreover, in response to question No. 8(a), 63.6% of respondents shown the saline packets believed that SinuCleanse and SinuSense were made by companies with a business affiliation.  *Id*.  Based on the survey results, Dr. Belch opined that the likelihood of "confusion between the SinuCleanse and SinuSense brand names is quite high."  Docket No. 271-1 at 18.

### 2.   *Survey Universe*

Water Pik argues that Dr. Belch's survey universe[3] is overinclusive because it does not adequately limit survey respondents to prospective users of sinus wash products.  Docket No. 306 at 6.  Additionally, Water Pik claims that Dr. Belch's survey sample is not representative of its chosen universe as Dr. Belch intentionally skewed the sample's demographics in order to include a desired population.  *Id*. at 7.

Med-Systems responds that Dr. Belch's survey universe is not overinclusive because consumers likely to purchase sinus remedy products in the next six months include prospective consumers of SinuSense™ sinus wash products.  Docket No. 184 at 4.  Med-Systems argues that people suffering from "chronic sinusitis," "allergies," "a sinus ailment," or "preventative sinus health" are all potential purchasers of SinuSense™ sinus wash products.  *Id*.

---

[3]A survey "universe" is that segment of the population whose perceptions and state of mind are relevant to the issues in a particular case.  *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-19 (3d Cir. 2004).

A survey universe is an important factor in assessing the validity of a survey because survey respondents must "adequately represent the opinions which are relevant to the litigation." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996). Consequently, a survey's "appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980). And a court should exclude a survey when "the sample of respondents clearly does not represent the universe it is intended to reflect." *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005).

Med-Systems' counterclaim for trademark infringement is based on the theory of forward confusion. Forward confusion occurs when the junior user – Water Pik – diverts the senior user's – Med-Systems – consumers and attempts to capitalize on the senior user's existing reputation and goodwill. *Altira Group, LLC v. Philip Morris Cos., Inc.*, 207 F. Supp. 2d 1193, 1197 (D. Colo. 2002). In cases of forward confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services." McCarthy § 32:159 (emphasis in original); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (same). The relevant universe of consumers for the purposes of this case is those likely to purchase Water Pik's SinuSense™ sinus wash products. *See* Docket No. 261 at 5-6 (discussing Water Pik's attempts to enter to sinus wash market); *see also* Docket No. 167 at 8 (Med-Systems' Rule 702 motion arguing that the relevant universe includes "potential

consumers of SinuSense and Sinu*Cleanse*® nasal wash products whose partronage is sought by both Med-Systems and Water Pik.").

Dr. Belch selected respondents by screening for consumers who had "Purchased [a] sinus remedy" product in the last six months or intended to purchase one in the next six months.  Docket No. 271-1 at 21.  Additionally, Dr. Belch did not narrow his survey universe to include only potential users of sinus wash products because he believed that general sinus remedy product users and sinus wash product users consisted of the same population.  Docket No. 165-3 at 5 (Belch Dep. 24:8-9).  However, it is undisputed that, when compared to the general population of sinus remedy product users, sinus wash users only account for 1% of sales in the $3 billion sinus remedy industry.  Docket No. 165-3 at 7 (Belch Dep. 26:1-17).  Given that the relevant population targeted by Water Pik's allegedly infringing products is users of nasal wash products (i.e. neti pots, saline refills, and squeeze bottles), Dr. Belch's failure to differentiate between general sinus remedy product users and prospective sinus wash users renders his survey universe overinclusive. [4]

Although Med-Systems claims that potential sufferers of "chronic sinusitis" and individuals with allergies or a "sinus ailment" are relevant to the study, there is no indication that Dr. Belch sought to determine whether the respondents to the survey suffered from those conditions.  *See generally* Docket No. 271-1.  Additionally, Dr. Belch did not determine whether any of the survey respondents had ever purchased nasal wash products, intended to do so in the future, or had ever considered buying

---

[4] Out of the 401 consumers surveyed by Dr. Belch, 148 respondents had utilized sinus wash products.  *See* Docket No. 165-8 at 1.

these products.  *See id*.  Contrary to Med-Systems' claim, because consumers of sinus wash products account for only 1% of sinus remedy product sales, not all purchasers of general sinus remedy products are prospective purchasers of sinus wash products.

Although Dr. Belch's consumer survey tests the opinion of some prospective nasal wash product consumers, his survey universe does not determine what percentage of respondents is likely to purchase sinus wash products.  This error reduces the weight accorded to his conclusions because the survey includes the opinions of a large number of irrelevant consumers.  *Big Dog Motorcycles,* 402 F. Supp. 2d at 1334 (finding that a study of buyers likely to purchase t-shirts and hats was entitled to little weight because it was overinclusive); *see also Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) (noting that the probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate).

### 3.  Survey Sample

Water Pik next asserts that, in addition to an overinclusive survey universe, Dr. Belch's sample is not representative of the target universe.  Water Pik claims that, because Dr. Belch manipulated his survey demographics to ensure greater representation in the older age groups, his survey is not a reliable representation of prospective nasal wash consumers.  Docket No. 306 at 7-8.  Additionally, Water Pik argues that Dr. Belch's intentional modification of the survey sample adds uncertainty to an already overinclusive survey universe, making his conclusions immaterial.  *Id*. at 8.

Water Pik contends that the compounded effect of an unrepresentative universe and a nonrepresentative sample renders Dr. Belch's survey conclusions wholly irrelevant.  *Id*.

Dr. Belch based his sample universe on MediaMark, Inc.'s ("MRI") profile of sinus remedy users.  Docket No. 271-1 at 2-3.  MRI is a company that provides consumer data based on profiles of users in over 550 categories.  *Id*.  In drawing his sample, Dr. Belch intentionally increased the sample population of respondents over the age of 55 to ensure they represented 42.1% of the survey, while the data from MRI reflected that general sinus remedy users over the age of 55 constituted only 28.5% of the population.  *Compare* Docket No. 307 at 1[5] *with* Docket No. 165-7.  In his deposition, Dr. Belch explained that he skewed the sample size in this regard because David Gallo, Med-Systems' co-founder, was of the belief that "sinus remedy users tended to skew a little bit older than the profile that was on the MRI data."  Docket No. 165-3 at 4 (Belch Dep. 23:17-19).

Dr. Belch's manipulation of the underlying sample raises questions about the survey's overall trustworthiness.  *See* McCarthy § 32:159 ("A survey of the wrong 'universe' will be of little probative value in litigation.").  This is especially true because Dr. Belch's survey was based on a representative sample and not a probability sample.  *See* McCarthy § 32:159 ("only a probability sample can be projected to the entire universe by the use of definite mathematical and statistical probability models.").  In a representative survey, the goal is to design a sample that is representative of the target

_____

[5]During his deposition, Dr. Belch corrected p. 20 of his report to reflect that those over the age of 55 represented 42.1% of the sample population.  Docket No. 191-3 at 2 (Belch Dep. 102:15-17); *see also* Docket No. 307 at 1 (Ex. 315, Dr. Belch's updated survey sample demographics).

population.  *Id.*  However, because Dr. Belch intentionally deviated from the MRI

demographic data, his "sample is clearly not representative of the universe it is intended

to reflect."  *Bank of Utah v. Commercial Sec. Bank*, 369 F.2d 19, 27 (10th Cir. 1966).

Moreover, the fact that Dr. Belch's survey universe is overinclusive raises concerns

about whether its conclusions "adequately represent the opinions which are relevant to

the litigation."  *Harolds Stores,* 82 F.3d at 1544.  Thus, it is not certain that the survey

respondents' opinions are probative on the issue of whether and to what degree

prospective customers are likely to believe products sold under the SinuSense™ mark

are affiliated with Med-Systems.  Accordingly, Dr. Belch's failure to survey an adequate

universe of respondents and to draw an accurate representative sample further

diminishes the survey's probative value.

### 4.   Survey Design

Water Pik argues that Dr. Belch's survey is flawed because: (1) it was not

designed to test confusion as to the source of the marks; (2) it biased respondents by

presenting the marks in a manner that does not replicate marketplace conditions; and

(3) it conducted a side-by-side comparison of the products which is contrary to Tenth

Circuit precedent.  Docket No. 306 at 8-9.

### a.   Confusion as to Source

Water Pik claims that Dr. Belch's survey was not designed to test the likelihood

of confusion as to the source of the products.  Docket No. 306 at 4.  In support, Water

Pik provides portions of Dr. Belch's deposition testimony to that effect.  *See, e.g.,*

Docket No. 165-3 at 28 (Belch Dep. 115:5-7) ("As I mentioned this morning, I was

asked to determine if there was confusion between the two brand names SinuSense and SinuCleanse."); *see id*. at 20 (Belch Dep. 75:18-19) ("the primary focus of the survey was to test the two [brand names]").  Additionally, Water Pik claims that, because Dr. Belch designed his survey only to test for the similarity between the SinuSense™ and Sinu*Cleanse*® marks, his findings do not assist the trier of fact because a jury is capable of making this determination.  Docket No. 306 at 5-6.

Although the record strongly indicates that Dr. Belch set out to determine only the degree of similarity between the SinuSense™ and Sinu*Cleanse*® marks, *see* Docket No. 271-1 at 2 (purpose of survey is to "determine if the brand names SinuCleanse and SinuSense may be perceived as to be so similar as to cause confusion"); Docket No. 165-3 at 33 (Belch Dep. 133:20-22) ("That's – what I was asked to answer was, is there confusion between the two brands – the two names SinuCleanse and SinuSense."), Dr. Belch nevertheless stated that, even if he was tasked with determining the likelihood of confusion as to the source of the products, he would have conducted the survey in the same manner.  Docket No. 165-3 at 20 (Belch Dep. 75:22-25).  Moreover, despite Dr. Belch's purpose in creating the survey, Med-Systems is correct when it states that the survey includes questions that, if appropriately designed, may help a trier of fact determine the likelihood of confusion as to the source.

### b.  Presentation of Marks

Water Pik argues that Dr. Belch's survey does not replicate market conditions because question No. 3 of the survey does not present the stylized version of the

Sinu*Cleanse*® mark, which is the only one consumers encounter.[6]  Additionally, Water Pik argues that Dr. Belch disassociates the SinuSense™ mark from the "Waterpik" company label, which does not replicate consumers' exposure to its products.  *See* Docket No. 191-2 (pictures of Water Pik sinus wash products).  Water Pik claims that, as a result of presenting the marks in this manner, Dr. Belch's survey "bias[es] the survey respondents with the intent to make them consider Sinu*Cleanse*® and SinuSense™ as more 'similar.'" Docket No. 306 at 10.

In response, Med-Systems claims that question No. 3 was designed to "prime" the respondents, meaning to get them to think about the products in general.  Docket No. 184 at 12; *see also* Docket No. 165-3 at 30 (Belch Dep. 126:14-16).  Additionally, Med-Systems contends that, because SinuSense™ is the prominent word that appears on all of Water Pik's nasal wash products, it was not an error for Dr. Belch to exclude the "waterpik" label.  Docket No. 184 at 13.

For a survey to provide reliable information, the survey must resemble the manner in which consumers would view the products in the marketplace.  *See Coherent, Inc. v. Coherent Techs., Inc.,* 935 F.2d 1122, 1126 (10th Cir. 1991).  The survey must attempt to replicate typical market conditions and simulate how a potential consumer would make a purchasing decision.  *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir. 1983).  Thus, "the closer the survey methods mirror

---

[6] Question No. 3.   Tell me what comes to mind when I say:
   a. SinuCleanse
   b. SinuSense
   c. Nielmed [sic]

the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  McCarthy § 32:163.

In typical marketplace conditions, Water Pik's products usually contain both the SinuSense™ mark and the "waterpik" label on the face of the packages.  *See, e.g.,* Docket No. 58 at 7-13.  Additionally, consumers only encounter Med-Systems' products with the Sinu*Cleanse*® mark in its stylized manner.[7]  Consequently, the Court finds that Dr. Belch's use of the unstylized Sinu*Cleanse*® mark and the separation of the SinuSense™ mark from the "Waterpik" label fails to adequately replicate market conditions.  *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1244 (9th Cir. 1984) (finding that similarities should be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase, including appearance and packaging).  Additionally, Dr. Belch's failure to include the name of Neilmed's product "Sinus Rinse™" also fails to reproduce market conditions. *See* Docket No. 165-3 at 18 (Belch Dep. 71:8-9), 33 (Belch Dep. 133:4-10).

Moreover, Med-Systems' claim that question No. 3 served only to prime respondents about sinus remedies further undermines the reliability of the survey since respondents, now exposed to an incomplete representation of the marks, would focus more attention on that representation to the detriment of anything subsequently presented on the products' packaging.  *See, e.g., Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1469 (D. Kan. 1996) (recognizing that when every

---

[7]Med-Systems fails to provide evidence that consumers encounter products bearing an unstylized Sinu*Cleanse*® mark and Dr. Belch never considered using italics for this question.  Docket No. 165-3 at 32 (Belch Dep. 131:8-11).

survey participant has been previously exposed to a trademark, the results of the survey may reflect the familiarity with the previously exposed trademark, not the overall look of the competing products).  Furthermore, use of Neilmed rather than Sinus Rinse™ creates more of an association between SinuSense™ and Sinu*Cleanse*® since they are closer in appearance than Neilmed.

### c.  Side-by-Side Comparisons

The Tenth Circuit has held that "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test" for showing a likelihood of confusion. *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1487-88 (10th Cir. 1987).  A survey that conducts such side-by-side comparison "bears little resemblance to the actual workings of the marketplace."  *Id*. at 1488; *Univ. of Kansas v. Sinks*, 2008 WL 755065, at *5 (D. Kan. March 19, 2008).  Therefore, the proper test for the likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with one of the party's marks, is presented with the other party's goods alone.  *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1090 (10th Cir. 1999).

Although, Med-Systems claims that SinuSense™ and Sinu*Cleanse*® products are sold side-by-side in department stores, Med-Systems provides no evidence to that effect.  It simply states that once "Walgreen's drugstore started selling the SinuSense brand, it formally stopped carrying the Sinu*Cleanse* brand.  However, it is likely that there are Walgreen's stores still selling both products on the same shelf."  Docket No. 184 at 5.  However, given the lack of evidentiary support, Med-Systems' claim is

16

conclusory and does not create a genuine dispute of fact.  *L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations ... do not create a genuine issue of fact.").

Nevertheless, Med-Systems asserts, and Water Pik does not dispute, that Sinu*Cleanse*® and SinuSense™ products can be found on the same internet websites. Docket No. 271 at 14.  In his affidavit, Dr. Gallo indicates that internet sales account for 6% of total Sinu*Cleanse*® sales.  Docket No. 192-1 at 2, ¶ 5.

Even taking the evidence in a light most favorable to Med-Systems and finding that, in some instances, consumers may encounter the two marks on the same internet page, there is no evidence that the internet sales allow for a consumer to examine the three products represented in Dr. Belch's survey in a side-by-side fashion.  By placing only the Neilmed, SinuSense, and SinuCleanse products together, Dr. Belch removes the scores of other products a consumer would encounter during an internet search and removes the need on the part of the consumer to sort through other products.  *See* Docket No. 186 at 10; *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1044 (S.D. Ind. 2000) (discounting a survey because of the small likelihood that internet results search would ever present the two web pages at issue together); *see also Univ. of Kan. v. Sinks*, 2008 WL 755065, at *5 (D. Kan. March 19, 2008) (finding side-by-side comparison "suspect" because, although the goods were sold in the same store, they were sold in separate area of the retail store).  Thus, because the obvious result of Dr. Belch's survey is to exaggerate any confusion that might be detected by focusing respondents' attention solely on the packaging of the three products, the probative

17

value of the survey is decreased.  *See Jordache Enters*, 828 F.2d at 1488 n.5 ("Other

surveys have easily avoided 'side-by-side' comparisons by simply showing a consumer

the product bearing the allegedly confusing mark and asking who manufactures the

product and what other products are sold by that manufacturer.").

### 5.   Leading and Suggestive Questions

Water Pik argues that the responses to questions 7, 8, and 9 of Dr. Belch's

survey are unreliable because they are "leading questions."  Docket No. 306 at 9.

Specifically, Water Pik alleges that question No. 7 of Dr. Belch's survey encourages

respondents to believe that at least two of the products are made by the same

company.  *Id*.  Med-Systems responds that Dr. Belch followed generally accepted

principles in designing all of his survey questions and that his questions are almost

identical to those found in Professor McCarthy's treatise on trademark law.  *Id*.  The

Court disagrees.

When evaluating the objectivity of a survey, a court must consider the degree of

suggestiveness of every survey question.  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010

WL 5186393, at *7 (D. Utah Dec. 15, 2010).  A survey is not credible if it relies on

leading questions which are "inherently suggestive and invite guessing by those who

did not get any clear message at all."  *Johnson & Johnson-Merck,* 19 F.3d at 134.

Moreover, questions posed as to the source of the product are leading and suggestive if

they imply the ultimate question the survey was designed to test.  *Native Am. Arts, Inc.*

*v. Bud K World Wide, Inc.*, 2012 WL 1833877, at *8 (M.D. Ga. May 18, 2012).

Because questions 7(a), 8(a) and 9(a) determine how and whether respondents reach the subsidiary questions listed, the Court will focus its analysis on whether these questions are leading or suggestive.  First, question No. 7(a) of the survey asks respondents: "Now, please tell me whether you think that . . . two or more of the products you see now are made by the same company."  Docket No. 271-1 at 27.  This question is suggestive because it introduces the possibility that one company made two or more of the products.  *See Johnson & Johnson-Merck*, 19 F.3d at 134 (finding a question leading when it invited respondents to guess even if they were unsure of the answer); *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *8-9 (S.D.N.Y. Aug. 6, 2007) ("[T]he back-to-back presentation of the parties' marks, followed by questions that asked respondents if they believed the marks were related, suggested to respondents that they *should* believe that a connection existed between the companies' marks.") (emphasis in original).  Rather than measure any actual confusion, the question suggests, at least implicitly, that respondents should believe that there is some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers.  *mySimon,* 104 F. Supp. 2d at 1044.  In contrast, Professor McCarthy's sample question asks respondents "What company do you think makes this product?"  McCarthy § 32:175.  In Professor McCarthy's question, the respondent must provide the name of the company on his own accord, thereby showing the surveyor the extent to which the respondent was confused by the marks, if at all.  In this regard, Professor McCarthy's question is not suggestive.

19

Question No. 8(a) asks respondents: "Looking at these products, do you think that . . . One or more of the COMPANIES WHO'S [sic] products you see now have a business affiliation or connection with the other shown here?"  Docket No. 271-1 at 28. Also, question No. 9(a) asks respondents: "Looking at these products, do you think that . . . One or more of the products you see now received permission or approval from the others shown here."  *Id*.  Both of these questions suggest to the respondent that there should be an association between the companies that produce the products in the survey.  *mySimon*, 104 F. Supp. 2d at 1048.  By limiting the respondents' answers to "others shown here," the question creates the impression of a relationship.  *See Wuv's Int'l, Inc. v. Love's Enters., Inc.*, 208 U.S.P.Q. 736, 755, 1980 WL 30296 (D. Colo. 1980) (finding the question "Do you believe that this restaurant is connected with or related to any other restaurants?" suggestive because the "respondent's choices are limited by the very terms of the question only to other restaurant operations").  In contrast, Professor McCarthy's sample question asks respondents "Do you think this product was approved, licensed or sponsored by another company or not?"  McCarthy § 32:175.  Professor McCarthy's question is open ended and allows respondents to determine what, if any, company approved or licensed a particular product.  More importantly, Professor McCarthy's question is not leading or suggestive because it does not limit respondents' responses to the companies affiliated with the products in the survey.

In addition, none of the questions in Dr. Belch's survey require that a respondent identify the name of a company.  However, it is axiomatic that a consumer cannot be confused as to the source of the marks if he had no previous knowledge of a particular

20

source.  *John Allan Co. v. Craig Allen Co. LLC*, 540 F.3d, 1133 1138 (10th Cir. 2008) (noting that the confusion analysis should focus on whether actual or potential consumers are likely to confuse the source, endorsement, affiliation, or sponsorship of a product).  Stated another way, a consumer cannot rely on a company's goodwill and reputation in making a purchasing decision if he is unaware of the company.  Thus, Dr. Belch's failure to question respondents as to the source of the marks divests the survey questions of any probative value.

Moreover, failure to determine whether respondents had knowledge of the companies is significant in Dr. Belch's survey because his survey universe includes a large number of non-prospective nasal wash product consumers.  Given the number of non-prospective consumers of nasal wash products, it is important to determine whether the respondents made representations of confusion based on a familiarity with the marks and the reputations associated with the marks and not simply because of the similarity of the names.  *See Weight Watchers Int'l , Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990) (reasoning that respondents who are not potential consumers may be less able to make source-indicating distinctions when compared to potential consumers); *Beneficial Corp. v. Beneficial Capital Corp*., 529 F. Supp. 445, 451 (S.D.N.Y. 1982) (finding that survey did not establish "meaningful evidence of actual confusion" because question asking respondents whether there was a business connection between companies with similar names "establishes no more than that the names are similar").  Without knowing which company respondents thought made the marks, it is unclear what the survey actually tests.

### 6.   Design Flaws and Weight

The Court retains the authority to determine what weight, if any, it should afford a

consumer survey.  *Johnson & Johnson-Merck*, 19 F.3d at 134; *Leelanau Wine Cellars,*

*LTD v. Black & Red, Inc.*, 502 F.3d 504, 518-19 (6th Cir. 2007) (upholding the district

court's finding that a flawed survey on the issue of actual confusion had little weight and

could not serve as dispositive proof of a likelihood of confusion).  Moreover, individual

flaws in methodology typically only relate to the weight of the survey evidence.

*Brunswick Corp.*, 832 F.2d at 523.  However, "when the deficiencies are so substantial

as to render the survey's conclusions untrustworthy, a court should exclude the survey."

*Hodgdon Powder Co.*, 512 F. Supp. 2d at 1181.  Dr. Belch's survey has an

overinclusive survey universe, an unrepresentative sample, replicates unrepresentative

market conditions, and contains suggestive questions.  The Court finds that the

substantial deficiencies in Dr. Belch's survey cumulatively render all of his conclusions

devoid of any probative value and therefore irrelevant as they do not make the

existence of a likelihood of confusion more or less probable.  *See Big Dog Motorcycles*,

402 F. Supp. 2d at 1334 (finding that the consumer survey results had essentially no

probative value where expert did not attempt to limit the survey universe); *Jordache*

*Enters.*, 828 F.2d at 1488 (district court did not err by giving little weigh to survey results

which bore "little resemblance to the actual workings of the marketplace"); *CareFirst of*

*Md., Inc. v. First Care P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (upholding district court

grant of summary judgment because survey had little probative value and could not

establish any evidence of a likelihood of confusion); *Ashland Oil, Inc. v. Olymco, Inc.*,

1995 WL 499466, at *4 (6th Cir. Aug. 21, 1995) ("It is the trial court's responsibility to determine the probative value of a consumer survey, and it is appropriate for the trial court to accord little or no weight to a defective survey"); *see also Winning Ways,* 913 F. Supp. at 1465 (excluding survey evidence because the flaws associated with the survey do not make the existence of a likelihood of confusion more or less probable).  Given that Dr. Belch's survey has no probative value on the issue of a likelihood of confusion, the Court finds no clear error of law with its previous ruling.

### C.  Dr. David M. Yerkes' Expert Report[8]

Med-Systems argues that the Court committed clear error when it failed to consider Dr. David M. Yerkes' expert report on the similarity of the Sinu*Cleanse*® and SinuSense™ marks.[9]  Docket No. 271 at 11.  Med-Systems claims that Dr. Yerkes evaluated the sight, sound, and meaning of the SinuSense™ and Sinu*Cleanse*® marks and concluded that they were "extremely similar and this similarity weighs heavily in favor of finding a likelihood of confusion."  Docket No. 271 at 11.  Dr. Yerkes concludes that "'SinuCleanse' and 'SinuSense' are quite likely to be confused as names for sinus nasal wash products."  Docket No. 95-13 at 2.[10]

---

[8]Dr. Yerkes is an English Professor at Columbia University who focuses his study on the English language.  *See* Docket No. 95-13.

[9]Although the Court's previous Order does not mention Dr. Yerkes by name, it cites to Dr. Yerkes' report, considers its conclusions, and then rejects them.  *See* Docket No. 261 at 10-13.

[10] Dr. Yerkes' full findings are as follows:
In sight "SinuSense" differs from "SinuCleanse" over just one letter": "SinuSense" has an "S" in the middle where "SinuCleanse" has a "Cl" and an "a". And even the two letters "C" and "S" are often confused: the word "cleanse" is often spelled "clense", and the words "sense" and "cense" are often mistaken for each other.  Docket No. 95-13 at

In regard to appearance, the Court found that Sinu*Cleanse*® and SinuSense™ are significantly different because the words "cleanse" and "sense" are visually distinct. Docket No. 261 at 11.  Specifically, the Court found that with regard to the visual appearance of the two words "Sense" has fewer letters and is more easily read than "Cleanse," and that even if the letter "s" is often confused with the letter "c," the letters "s" and "cl" are considerably different.  Thus, the Court found that Med-Systems' argument – as proposed by Dr. Yerkes – was not only unsupported but that "no reasonable jury would find the marks visually confusing."  *Id*. at 11.

In regard to the sound of the marks, the Court also rejected Dr. Yerkes' opinion. Dr. Yerkes concluded that "cleanse" and "sense" would sound confusingly similar because they both have the exact same two middle sounds.[11]  Docket No. 95-13 at 2. In rejecting this opinion, the Court found that the two words are pronounced in distinctly different ways, and that "[n]o reasonable jury could conclude otherwise."  Docket No. 261 at 12.

Finally, Dr. Yerkes concluded that the marks were similar in meaning because both Sinu*Cleanse*® and SinuSense™ conveyed the notion of "sinus-related

---

2.

[11] Dr. Yerkes' full findings are as follows:
In sound "SinuCleanse" and "SinuSense" both have three syllables, the first two of which are pronounced exactly the same –[sinu] –and the third of which–[klenz] and [sens]– are similar.  "Cleanse" and "Sense" have exactly the same two middle sounds –[en]– and have almost exactly the same last sound, [z] or [s].  At the end of many words or names a [z] sound and a [s] sound are interchangeable.  Docket No. 95-13 at 2.

treatment."[12]  Docket No. 95-13 at 2.  The Court rejected this argument and found that,

"regardless of whether 'SinuSense' means a sensory perception, good judgment, or

nothing, its meaning is different from cleansing the sinuses."  Docket No. 261 at 12-13.

Given that the Court considered each of Dr. Yerkes' conclusions, Med-Systems'

argument that the Court erred in not discussing them is incorrect.

Moreover, because the Court found that no reasonable jury could agree with Dr.

Yerkes' conclusions, his opinions fail to raise any genuine issues of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) ("discredited testimony is

not [normally] considered a sufficient basis for drawing a contrary conclusion" at the

summary judgment stage).

### D.  Use of the Prefix "Sinu"

Med-Systems claims that the Court misinterpreted facts in the summary

judgment order with respect to two issues.  First, Med-Systems challenges the Court's

determination that the term "sinu" is generic.  Docket No. 271 at 12.  Second,

Med-Systems argues that it is disputed whether the term "sinu" is "ubiquitous in the

sinus irrigation market."  *Id*.[13]

---

[12] Dr. Yerkes' full findings are as follows:
The names "SinuCleanse" and "SinuSense" are similar in meaning.  Both the names
"SinuCleanse" and "SinuSense" convey the notion of "sinus-related treatment."  Water
Pik's own press release says to use its "SinuSense" products for a "sinus **cleanse**", and
Water Pik's own website says that its "Sinu**Sense**" product is a "sinus-**cleansing**
experience."  Docket No. 95-13 at 2.

[13]Med-Systems also claims that the Court erroneously relied on deposition
testimony which was not presented in the record.  Docket No. 271 at 13.  Med-Systems
claims that the Court's citation to Docket No. 57-1 at 22-34 is a reference to unattached
portions of Dr. Heatly's deposition.  However, pages 22 to 34 of Docket No. 57-1 is
Exhibit 32 of Dr. Gallo's deposition, which are copies of several federally registered

Although Med-Systems argues that the term "sinu" is not generic, it provides no evidence to the contrary.  Med-Systems asserts that its decision not to challenge a mark because it contains "sinu" is a prudent business decision and not an acknowledgment that it has no protection based on third parties' use of the term "sinu." Docket No. 271 at 12.  However, Med-Systems' rationale for not pursuing legal challenges is not evidence in support of its argument.

Under federal law, for a mark to be protectable, it "must be capable of distinguishing the products [or services it represents] from those of others."  *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004).  Of the various categories of marks, a mark is generic if it has a common description of products or refers "to the genus of which the particular product is a species."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  Morever, because a generic mark, by definition, neither signifies the source of goods nor distinguishes the particular product from other products on the market, a generic term cannot be protected as a trademark.  *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

Med-Systems does not provide evidence showing that the term "sinu" does not refer to a particular type of goods.  In fact, Dr. Gallo, Med-Systems' CEO, acknowledged that a number of companies use the prefix "sinu" to describe products related to sinus treatment.  Docket No. 95-2 at 12-13 (Gallo Dep. 78:16-79:3). Moreover, given that both Dr. Gallo and Dr. Heatly, Med-Systems' co-founder,

---

trademarks utilizing either the prefix "sinu" or "sinus."

acknowledged that the terms "sinus" and "sinu" are widely used with respect to products

to treat sinuses,  Docket No. 57-1 at 7 (Heatly Dep. 24:1-3) (noting that a lot of

companies use the term "sinus" or "sinu" with respect to the treatment of sinus

problems); Docket No. 57-2 at 6 (Gallo Dep. 78:13-20) (noting that "sinu" refers to

"sinus" and is a signal for products relating to sinuses), Med-Systems fails to provide

evidence that the term "sinu" can distinguish any one particular product.  Thus,

Med-Systems' argument that the term "sinu" is not generic is unsupported and therefore

does not raise a genuine issue of material fact.  *See L & M Enters.*, 231 F.3d at 1287

("Unsupported conclusory allegations ... do not create a genuine issue of fact.").  The

Court finds no error with the classification of the term "sinu" as generic.

In any event, a determination of whether the term "sinu" is a generic term is not

material to the issues in this case.  In its motion, Med-Systems does not dispute the

Court's determination that Sinu*Cleanse*® is a descriptive mark nor does it challenge the

conclusion that the mark has not acquired secondary meaning.  Thus, Med-Systems'

primary argument challenges the Court's analysis with regard to the commercial

strength of the Sinu*Cleanse*® mark.  In the summary judgment order, the Court found

that the Sinu*Cleanse*® mark has little commercial strength because of third parties'

widespread use of the prefix "sinu."  Docket No. 261 at 25.

Med-Systems also relies on not having admitted that the use of "sinu" is

ubiquitous in the nasal irrigation market, Docket No. 261 at 12, but provides no

evidence to show that the term "sinu" is not widely used.  As noted above,

Med-Systems' own CEO, Dr. David Gallo, acknowledged that a number of companies

use the terms "sinus" or "sinu" for products dealing with sinus related treatment.  Docket

27

No. 57-2 at 6 (Gallo Dep. 78:13-79:3).  Moreover, exhibit 32 to Dr. Gallo's deposition

shows copies of several registered trademarks incorporating the prefix "sinu" such as

sinucare, sinusurf, sinumist, and sinutouch.  *See* Docket No. 57-1 at 22-34.

Med-Systems' dispute of the prevailing use of the term "sinu" is unsupported, and as

such Med-Systems fails to demonstrate that the Court's determination that the

Sinu*Cleanse*® mark has relatively little commercial strength was a clear error of law.

### E.   Unstylized Mark

Med-Systems argues that the Court erred by not analyzing its unstylized

Sinu*Cleanse*® mark in its likelihood of confusion analysis because, although

consumers may not encounter the unstylized Sinu*Cleanse*® mark in department stores,

they may encounter the SinuCleanse® mark on its website or in other advertising.

Docket No. 271 at 14.  Med-Systems relies on Dr. Gallo's deposition testimony in order

to prove that customers encounter SinuCleanse®'s unstylized mark.  *See* Docket No.

95-2 at 9-10 (Gallo Dep. 74:2-10, 76:7-16).  However, Med-Systems' evidence does not

support this argument.  The cited portions of Dr. Gallo's deposition refer only to one

product, "SinuCleanse Squeeze," and do not mention the internet or any other place

where a consumer would view that product.  Accordingly, Med-Systems' argument that

consumers are exposed to the unstylized Sinu*Cleanse*® mark has no evidentiary

support in the record.

To the extent Med-Systems alleges that radio commercials or oral

recommendations from doctors is evidence that consumers are exposed to the

unstylized version of the Sinu*Cleanse*® mark, Docket No. 271 at 14, the Court is

unconvinced.  Prospective consumers listening to the term "SinuCleanse" do not have an opportunity to perform a visual inspection of the mark and therefore cannot differentiate between the stylized and the unstylized Sinu*Cleanse*® mark.  Accordingly, Med-Systems fails to show that the Court committed clear error when it did not consider the unstylized Sinu*Cleanse*® mark in its likelihood of confusion analysis.

In sum, the Court finds that Med-Systems has failed to demonstrate that the Court's previous order [Docket No. 261] was based on a clear error of law under Rule 59(e).

## III.   CONCLUSION

It is

**ORDERED** that Med-Systems' Motion for Reconsideration and Alteration of the Judgment Pursuant to Federal Rule of Civil Procedure 59(e) [Docket No. 316] is **DENIED**.

DATED June 13, 2012.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge